# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00001-CV

Reliant Energy, Incorporated and American Electric Power Company, Appellants

v.

Public Utility Commission of Texas, Appellee

## DIRECT APPEAL FROM THE PUBLIC UTILITY COMMISSION OF TEXAS

## O P I N I O N

In this direct appeal, we must determine whether the Public Utility Commission erred in promulgating a rule governing stranded-cost recovery for formerly regulated electric utilities. *See* Tex. Util. Code Ann. ' 39.001(e), (f) (West Supp. 2003). Stranded costs represent prudently incurred expenditures made by the utilities during regulationC previously recoverable over time through regulated ratesC that have become unrecoverable in a deregulated market. Utilities are permitted to recover their stranded costs as part of the transition to competition in Texas. Reliant Energy, Incorporated and American Electric Power Company (AAEP@) argue that

the Public Utility Commission[1] exceeded its authority by promulgating portions of substantive rule 25.263, which governs the proceeding where the Commission is to determine whether a utility actually has stranded costs and to reconcile a utility=s actual stranded costs with amounts already recovered based on previous estimates.  We hold that the Commission exceeded its authority in promulgating some of the challenged portions of its rule and reverse and remand those portions to the Commission for further proceedings in accordance with this opinion.  *See* Tex. Util. Code Ann. **'** 39.001(f).  We affirm the remaining portions of the rule as enacted.  *See id.*

## BACKGROUND

---

[1] In addition to the Commission, several **intervenors** argue in support of the rule.  They include the Office of Public Utility Counsel (OPUC), the Steering Committee for Cities Served by TXU Electric and Central Power and Light Company (SCC), Texas Industrial Energy Consumers (TIEC), the State of Texas, and the Alliance for Retail Markets (ARM).  TXU Electric Company was also a party to this appeal but it has since settled with the Commission and filed a motion to dismiss.  We have granted TXU=s motion and dismissed its claims.

In 1975, the legislature enacted the Public Utility Regulatory Act (PURA) creating the Public Utility Commission and establishing a comprehensive regulatory regime for electric utilities. At that time, it was thought that electric utilities were natural monopolies, immune from the normal forces of competition. Under the regulatory regime created by PURA, each utility was allowed to operate as a monopoly in the area it served but was prohibited from charging monopoly prices. The Commission was authorized to set rates for each utility at a level that would allow it to recoup its prudently incurred costs and to earn a reasonable return on its investments.[2] *See* **16 Tex. Admin. Code ' ' 25.231, .235(a) (2002);** *see also Central Power & Light Co. v. Public Util. Comm=n*, **36 S.W.3d. 547, 553 (Tex. App.** C **Austin 2000, pet. denied) (describing utility ratemaking procedure under regulation).**

When the legislature enacted PURA most electric utilities were large vertically integrated companies that produced, transported, and retailed electricity. In truth, only one

_____

[2] The utilities could recoup, among other things, the following expenses if reasonably incurred:

$ operation and maintenance costs incurred in furnishing normal service and in maintaining plants

$ assessed taxes

$ fuel and purchased power costs
$ ordinary advertising costs

$ post-retirement benefit-plan costs

$ costs of certain assets through depreciation

*See* 16 Tex. Admin. Code ' ' 25.231, .235(a) (2002).

**component of a vertically integrated electric utility immunizes it from the normal forces of competition**Cits transmission and distribution infrastructure. Recognizing this, the legislature amended PURA in 1999 and partially deregulated the industry. Among its Apolicies and purposes,@ the legislature found that:

> [T]he production and sale of electricity is not a monopoly warranting regulation of rates, operations, and services and that the public interest in competitive electric markets requires that, except for transmission and distribution services and for the recovery of stranded costs, electric services and their prices should be determined by customer choices and the normal forces of competition.

Tex. Util. Code Ann. ' 39.001(a) (West Supp. 2003).

Chapter thirty-nine of PURA governs the restructuring of the electric-utility industry. As of January 1, 2000, each privately owned electric utility was required to Aunbundle@ or separate into the following entities: a power generation company, a retail electric provider, and a transmission and distribution utility. *See id.* ' 39.051(b) (West Supp. 2003). The former vertically integrated utilities can now operate as holding companies that own affiliated unbundled entities. *See id.* ' 39.051(c) (West Supp. 2003). Under deregulation, the power generation and retail markets are to be governed by Acustomer choices and the normal forces of competition,@ while the Commission is to continue to regulate transmission and distribution utilities. *See id*. ' 39.001(a). The Commission is also charged with facilitating stranded-cost recovery for the formerly regulated utilities. *See id.*

Chapter thirty-nine defines stranded costs as Athe positive excess of the net book value of generation assets over the market value of those assets. . . .@ *See id.* ' 39.251(7) (West Supp. 2003). The

basic concept of stranded costs is straightforward.  Under regulation, a utility could recover over time **its prudently incurred costs of acquiring power-generation assets through rates approved by the Commission and paid by captive customers.  *See Central Power & Light Co.*, 36 S.W.3d at 552-53.  The Commission facilitated this cost recovery by incorporating depreciation expenses into approved rates.  *See id.* at 53.  But in a deregulated environment, it was thought that competition might drive rates to levels so low that a formerly regulated utility would be unable to recoup its investments.  Stranded costs represent that portion of the net book value of a utility=s generation assets not yet recovered through depreciation that has become unrecoverable in a deregulated environment.  *See City of Corpus Christi v. Public Util. Comm=n*, 51 S.W.3d 231, 237-38 (Tex. 2001); Tex. Util. Code Ann. ' 39.251(7).**

**Chapter thirty-nine sets out a three-stage program for the recovery of stranded costs.  In the first stage, from September 1999 to December 2001, the Commission froze retail electric rates.  *See* Tex. Util. Code Ann. ' ' 39.052(a), .254-.256 (West Supp. 2003).  During this stage, utilities identified as having probable stranded costs[3] were required to Amitigate@ them through various measures intended to reduce the book value of their generation assets.  *See id.* They could shift depreciation from transmission and distribution assets to generation assets, *id.* ' 39.256; they could keep earnings in excess of the allowed rate of return, *id.* ' 39.254.  These utilities were also allowed to Asecuritize@ a portion of their estimated stranded costs by selling**

--------

**[3] These utilities were identified in an April 1998 Commission Report to the Texas Senate Interim Committee on Electric Utility Restructuring.  In making these estimates, the Commission utilized an AExcess Cost Over Market@ computer model (ECOM model).**

transition bonds and using the proceeds to reduce the book value of their generation assets. *See id.* '' 39.301-.313 (West Supp. 2003). The costs of issuing and servicing transition bonds are borne by all retail customers in a utility=s service area through a nonbypassable Atransition charge.@ *See id.* '' 39.302(7), .303(b), (c); *City of Corpus Christi*, 51 S.W.3d at 239. Because the Commission estimated in 1998 that the appellant utilities would have significant stranded costs in a deregulated environment, each utility used the available mitigation procedures and securitization to reduce the book value of their generation assets during this stage of PURA=s stranded-cost recovery program.[4]

The second stage began on January 1, 2002, the first day of competition. *See* Tex. Util. Code Ann. '' 39.001(b)(1), .201 (West Supp. 2003). During this stage, the Commission was

---

[4] *See generally* Tex. Pub. Util. Comm=n, *Application of Reliant Energy, Incorporated for Financing Order to Securitize Regulatory Assets and Other Qualified Costs*, Docket No. 21655 (2000); Tex. Pub Util. Comm=n, *Application of Central Power and Light Company for Financing Order to Securitize Regulatory Assets and Other Qualified Costs*, Docket No. 21528 (2000); Tex. Pub. Util. Comm=n, *Application of Reliant Energy for Approval of Unbundled Cost of Service Rate Pursuant to PURA ' 39.201 and Public Utility Commission Substantive Rule ' 25.344*, Docket No. 22355 (2001); Tex. Pub. Util. Comm=n, *Application of Central Power and Light Company for Approval of Unbundled Cost of Service Rate Pursuant to PURA ' 39.201 and Public Utility Commission Substantive Rule ' 25.344*, Docket No. 22352 (2001).

authorized to set a nonbypassable Acompetition transition charge@ to allow utilities to recover any stranded costs remaining after the mitigation procedures and securitization utilized in stage one. *See generally id.* ' 39.201. Any competition transition charge was to be included in the tariffs of a utility=s affiliated unbundled transmission and distribution utility. *See id.* ' 39.201(b)(3). In determining whether to set such a charge, the Commission was required to revise its previous stranded-cost estimates using Aupdated company-specific inputs.@ *See id.* ' 39.201(h).

In preparation for the rate hearings for the transmission and distribution utilities to be held in 2001, the stranded cost estimates were updated. The Commission=s updated estimates unexpectedly reflected that the utilities would have *no* stranded costs.[5] A substantial increase in natural gas prices in 2000 had driven the market value of the utilities= generation assets well above their book value. These new estimates therefore indicated that some utilities had been overcompensated by their earlier mitigation procedures and securitization.

In light of these revised estimates, the Commission issued orders requiring the utilities to discontinue all mitigation efforts, to reassign the depreciation transferred from

---

[5] *See generally* Tex. Pub. Util. Comm=n, *Application of Reliant Energy for Approval of Unbundled Cost of Service Rate Pursuant to PURA* ' *39.201 and Public Utility Commission Substantive Rule* ' *25.344*, Docket No. 22355, p. 139; Tex. Pub. Util. Comm=n, *Application of Central Power and Light Company for Approval of Unbundled Cost of Service Rate Pursuant to PURA* ' *39.201 and Public Utility Commission Substantive Rule* ' *25.344*, Docket No. 22352, p. 120.

7

transmission and distribution assets back to those assets, and to return monthly Aexcess mitigation credits@ to retail providers and their ratepayers. The Commission did not, however, require the utilities to refund the amounts they had received from selling transition bonds, and by statute it could not alter the transition charge that had been imposed on ratepayers to service the bonds. *See id.* ' 39.303(d) (Transition charge authorized in financing order is Airrevocable and not subject to reduction, impairment, or adjustment by further action of the commission . . . .@). Utilities that had sold transition bonds to recover stranded costs no longer anticipated would seem to have received a windfall at the ratepayers= expense.

The third and final stage of stranded-cost recovery is yet to occur. This stage requires the Commission to conduct a Atrue-up proceeding@ sometime after January 10, 2004, to determine whether a utility actually has remaining stranded costs. *See id.* '' 39.201(l), .262(c) (West Supp. 2003). The challenged rule governs the conduct of this true-up proceeding. *See* 16 Tex. Admin. Code ' 25.263 (2002). The goal of the true-up proceeding in this third stage is to determine the utility=s actual stranded costs and to reconcile or true up this determination with its previous estimates. *See* Tex. Util. Code Ann. '' 39.201(l), .262(c). This final determination is to be based on a new calculation of the value of a utility=s generation assets made under actual competitive conditions. *See id.* The Commission is required to subtract the market value of a utility=s generation assets from the book value of those assets.[6] *See id.* '' 39.251(7), .252(a), .262(c), (h), (i)

---

[6] The ECOM model remains applicable in 2004 only to the extent that a utility has nuclear assets that are not susceptible to market valuation under the methods described in PURA section 39.263(h). *See* Tex. Util. Code Ann. ' 39.262(i) (West Supp. 2003).

8

(West Supp. 2003). If the calculation yields a positive number, *i.e.*, if the book value of the assets exceeds their market value, then the utility has stranded costs it is entitled to recover. If the calculation yields a negative number, *i.e.*, if the market value of the assets exceeds their book value, the utility has no stranded costsCand chapter thirty-nine does not provide for any return to ratepayers of so calledAnegative stranded costs.@ If this true-up proceeding reveals that the utilities over-recovered estimated stranded costs through their earlier mitigation efforts, the Commission can make appropriate adjustments by, among other things, reducing the unbundled transmission and distribution utility=s rates. *See id.* ' 39.201(l). The Commission cannot, however, reduce the transition charge imposed on ratepayers to service transition bonds. *See id.* ' 39.303(d).

**In addition to finalizing stranded costs, chapter thirty-nine also requires that the Commission make several other Atrue-up@ calculations in the 2004 proceeding that could affect customer rates. *See id.* ' 39.262(d)-(g) (West Supp. 2003). These calculations reconcile previous estimates with known values in various areas and result in either credits or bills to the transmission and distribution utility from its affiliated power generation company or retail electric provider. *See generally id.* Based on these credits or bills, the transmission and distribution utility is to make adjustments to its nonbypassable delivery rates. *See id.* ' 39.262(g).**

**One of these several other true-up calculations involves the determination of a utility=s final fuel balance. *See id.* '' 39.202(c), .262(d)(1) (West Supp. 2003).** In the 2004 proceeding, the Commission must true up the actual cost of fuel incurred by the utility against the prior estimate used to set the Afuel factor@ component of regulated rates during the final period of traditional

regulation. *See id.* A positive fuel balance represents money owed to the utility for under-recovered fuel costs.[7] *See id.* The challenged portion of rule 25.263 would reduce this positive fuel balance owed to the utility by any negative stranded-cost calculation—regardless of whether the negative calculation was caused by market forces or by previous over-recovery through securitization. *See* 16 Tex. Admin. Code ' 25.263(l).

The utilities argue that there is no such thing as negative stranded costs. They also complain that the fuel balance is not a stranded cost and therefore cannot be Anetted@ against a negative stranded-cost calculation. In other words, according to the utilities, the true-up proceeding was never intended to reconcile a negative stranded-cost calculation against a positive fuel-balance calculation to reduce the amount due to the utility for under-recovered fuel costs. The Commission insists that it has a mandate to prevent a utility from receiving an over-recovery of stranded costs and that offsetting sums due for a positive fuel balance is a permissible means of reversing an over-recovery of stranded costs achieved through securitization. We begin our analysis by examining how the rule works.

## THE RULE

---

[7] A positive final fuel balance is to be recovered through the mechanism described above: each affiliated power generation company will bill the regulated transmission and distribution utility, which will, in turn, increase its nonbypassable delivery rates. *See id.* ' ' **39.202(c), .262(d)(1), (g).**

Rule 25.263 requires the relevant portion of the true-up proceeding to be conducted in four steps. First, the Commission subtracts the newly calculated market value[8] of the utility=s generation assets from the net book value of those assets. According to the statute, if this number is positive, the utility has recoverable stranded costs; if it is negative, the utility has no stranded costs.[9] *See* Tex. Util. Code. Ann. ' ' 39.251(3), (7), .252(a) (West Supp. 2003). A negative number may be due to over-recovery of stranded costs that reduced the book value of assets during the first stage, but it may also result from unrelated market conditions that increased the market value of the assets.

Second, the Commission calculates the utility=s final fuel balance, which is the differenceCpositive or negativeCbetween the estimated cost of fuel that was used to set the utility=s rates for the final period of regulation and the actual cost of fuel for that period. Under the prior regulatory regime, this amount would have been includedCas a credit or chargeCin the rates set at the utility=s next ratemaking proceeding. Under the challenged section of rule 25.263, this final fuel balance is netted against the actual stranded costs determined in step one. Thus, a

---

[8] Chapter thirty-nine sets out several methods for calculating the market value of a utility=s generation assets. One part of rule 25.263 that the utilities challenge is the section that implements the Apartial stock valuation@ method. *Compare* Tex. Util. Code Ann. ' 39.262(h)(3), *with* 16 Tex. Admin. Code ' 25.263 (f)(1)(c) (2002).

[9] There will sometimes be a third step. If a utility has nuclear assets that are not susceptible to the normal market valuation methods, the Commission conducts an updated ECOM estimate to determine whether investments in these assets are stranded and nets this calculation with stranded-cost determination for the rest of the assets. *See* Tex. Util. Code Ann. ' 39.262(i) (West Supp. 2003); 16 Tex. Admin. Code ' 25.263(f)(2) (2002).

negative stranded cost calculation could reduce or eliminate a positive fuel balance owed to the utility.

Third, the Commission calculates a Acapacity-auction true-up@amount, which is the difference between the price the utility, or its unbundled power generation affiliate, was estimated to obtain for its power on the wholesale market in the second stage and the price the utility actually received during the first two years of competition. *See* 16 Tex. Admin. Code ** 25.263(i), (l) (2002). The actual market price is reflected in Acapacity auctions@in which the utility sold its entitlements to generation capacity to reduce its market share as a part of the transition to competition. *See* Tex. Util. Code Ann. ** 39.153, .156 (West Supp. 2003). The capacity-auction true-up amount must then be netted against the amount reached in step two by netting the stranded costs determined in step one with the fuel balance.

Fourth, and finally, the Commission will conduct a prudence review of regulatory assets[10] not previously approved in a prior Commission rate order but being recovered through securitization in the form of a transition charge or through a competition transition charge imposed during the second stage of stranded-cost recovery. *See* 16 Tex. Admin. Code * 25.263(l) (2002). If the Commission determines that these assets were not prudently incurred, it will

___

[10] Regulatory assets are a subset of generation-related costs incurred by a utility. *See City of Corpus Christi v. Public Util. Comm=n*, 51 S.W.3d 231, 238 (Tex. 2001). They arise when the regulatory regime requires that a utility=s right to recover an expenditure be deferred over several years. *See id.* The right to recover this income stream in future years is carried on the utility=s books as a regulatory asset. *See id.* Regulatory assets therefore have no market value absent a regulatory regime that assures their recovery. *See id.*

subtract them from the true-up balance as determined in steps one through three. If the resulting final true-up balance is positive, the utility will be entitled to recover that amount through a competition transition charge assessed to its transmission and distribution customers. *See id.* ' 25.263(l)(2)(A). If negative, the Commission will (1) reverse any existing competition transition charge, then (2) reverse any remaining mitigation proceeds, then (3) impose on utilities that have sold transition bonds a negative competition transition charge based on the lesser of the absolute value of the remaining negative true-up balance or the amount the utility has securitized. *See id.* ' 25.263(l)(2)(C).

## DISCUSSION

This is a direct challenge to the validity of a chapter thirty-nine competition rule. *See* Tex. Util. Code Ann. ' 39.001(e). The utilities allege that certain portions of the rule exceed the Commission=s statutory authority.[11] *See id.*; *see generally City Pub. Serv. Bd. v. Public Util. Comm=n*, No. 3-00-007-CV, slip op. at 8, 2002 Tex. App. LEXIS 2059, at *12 (Tex. App. AustinCMar. 21, 2002, no pet.). An administrative agency has only those powers conferred upon it by clear and unmistakable language. *Public Util. Comm=n v. City Pub. Serv. Bd.*, 53 S.W.3d 310, 315-16 (Tex. 2001). When the legislature expressly confers a power on an agency, it also impliedly intends that the agency have whatever powers are reasonably necessary to fulfill its express functions or duties. *Public Util. Comm=n v. GTE-Southwest, Inc.*, 901 S.W.2d 401, 407 (Tex. 1995). An agency may not, however, exercise what is effectively a new power on the theory that such exercise is expedient for the agency=s purposes. *Id.* at 407. We must therefore determine whether the Commission had either the express or implied authority to promulgate the challenged aspects of its rule that will govern the 2004 true-up proceedings.

---

[11] We reject the Commission=s contention that the utilities= complaints are not properly brought as validity challenges because there may exist some hypothetical set of facts where the type of harm that the utilities predict might not actually occur. The utilities properly challenge the rule=s validity by arguing that several of its mandatory provisions were promulgated without

14

*Netting*

PURA provides that A[a]n electric utility is allowed to recover all of its net, verifiable, nonmitigable stranded costs incurred in purchasing power and providing electric generation service.@ Tex. Util. Code Ann. ' 39.252(a). The utilities challenge the Commission=s authority to net a utility=s final stranded-cost calculation with other true-up items such as a utility=s final-fuel balance. The Commission defends its rule arguing that (1) these other true-up items are themselves potential stranded costs and, (2) even if they are not, netting is a permissible means of preventing over-recovery of stranded costs by those utilities that received a windfall through securitization.

PURA defines stranded costs as follows:

> AStranded costs@ means the positive excess of the net book value of generation assets over the market value of those assets, taking into account all of the electric utility=s generation assets, any above market purchased power costs, and any deferred debit related to a utility=s discontinuance of the application of Statement of Financial Accounting Standards No. 71 [*i.e.*, unrecovered regulatory assets].

Tex. Util. Code Ann. ' 39.251(7). PURA further defines generation assets as follows:

---

statutory authority. *City Pub. Serv. Bd. v. Public Util. Comm=n*, No. 3-00-007-CV, slip op. at 8, 2002 Tex. App. LEXIS 2059, at *12 (Tex. App. AustinC Mar. 21, 2002, no pet.). (AIn order to be invalid, the 1999 Rule must, on its face, contravene the legislative grant of power.@)

> AGeneration assets@means all assets associated with the production of electricity, including generation plants, electrical interconnections of the generation plant to the transmission system, fuel contracts, fuel transportation contracts, water contracts, lands, surface or subsurface water rights, emissions-related allowances, and gas pipeline interconnections.

*Id.* ' 39.251(3).

As described above, at the true-up proceeding, the Commission is required to calculate a utility=s actual stranded costs by subtracting the market value of its generation assets from their book value. If this number is negative, *i.e.*, if the market value of those assets exceed their book value, it is undisputed that the utilities are *not* required to refund this negative amount to the ratepayers. Under chapter thirty-nine, there is simply no concept of negative stranded costs and no consequence of a negative calculation.

Chapter thirty-nine defines stranded costs as Athe *positive* excess of net book value of generation assets over the market value of the assets.@ *See id.* ' 39.252(7) (emphasis added). Because we presume that each word in a statute has meaning, the word Apositive@must be given effect. *See Southwestern Life Ins. Co. v. Montemayor*, 24 S.W.3d 581, 584 (Tex. App.CAustin 2000, pet. denied). Stranded costs therefore exist only when the book value of a utility=s generation assets exceeds their market value. If book value is equal to or less than market value, then there are no stranded costs. The term Anegative stranded costs@appears nowhere in chapter thirty-nine, and there are no statutory provisions providing for recovery by ratepayers of the excess market value over cost.

16

The fact that chapter thirty-nine does not recognize the concept of negative stranded costs motivates the Commission=s argument that all the true-up items represent stranded costs and that the netting required under its rule will determine actual stranded costs. The utilities protest that the other true-up items do not comprise stranded costs as they are defined in chapter thirty-nine and cannot be offset by a negative stranded-cost calculation. They focus particularly on showing that the final-fuel balance has nothing to do with stranded costs. The Commission responds by arguing that because coal, gas, nuclear, and other types of fuel are Aindisputably assets associated with the production of electricity,@ they constitute generation assets that could become stranded. We reject the Commission=s attempt to define these items as stranded costs.

Under the prior regulatory regime, the approved rates for a utility always included a Afixed fuel factor,@ which was based on a projection of future fuel costs. 16 Tex. Admin. Code ' 25.237 (2002). The Commission periodically adjusted this fuel factor, and at least every three years the fuel revenues the utility received under the factor were Areconciled@ with the fuel costs the utility actually incurred. *See* Tex. Util. Code ' 36.203 (West 1998); 16 Tex. Admin. Code ' 25.236 (2002); *see also Nucor Steel v. Pub. Util. Comm=n*, 26 S.W.3d 742, 744-45 (Tex. App.CAustin 2001, pet. denied). Chapter thirty-nine, section 36.202(c) simply postpones the fuel reconciliation for the final period of regulation until the 2004 true-up proceeding, at which time any under-recovered fuel balances will be surcharged.

The statutory structure of chapter thirty-nine also indicates that the legislature did not consider a final fuel balance to be a stranded cost. Stranded costs and the final fuel balance are determined and recovered under separate sections of chapter thirty-nine.

Stranded costs are determined and recovered under sections 39.201(l) and 39.262(c). Section 39.201(l) provides: "[t]wo years after customer choice is introduced, the stranded cost estimate under this section [*i.e.*, the stage-two stranded-cost estimate] shall be reviewed and, if necessary, adjusted to reflect a final, actual valuation in the true-up proceeding under Section 39.262." Tex. Util. Code Ann. ' 39.201(l). Section 39.262(c) provides:

> After January 10, 2004 . . . each transmission and distribution utility, its affiliated retail electric provider, and its affiliated power generation company shall jointly file to finalize stranded costs under Subsections (h) and (i) and reconcile those costs with the estimated stranded costs used to develop the competition transition charge in the proceeding held under Section 39.201.

*Id.* ' 39.262(c). Subsections (h) and (i) set out methods for quantifying the market value of a utility=s generation assets and calculating its stranded costs. Significantly, the final fuel balance does not figure into this calculation.

Under-recovered fuel costs are determined and recovered under section 39.202(c) and 39.262(d)(1). Section 39.202(c) provides: "[a]fter the date of customer choice, each affiliated power generation company shall file a final fuel reconciliation for the period ending the day before the date customer choice is introduced . . . [which will be] included in the true-up proceeding." *Id.* ' 39.202(c). Section 39.262(d)(1) provides "the affiliated power generation company shall

reconcile, and either credit or bill to the transmission and distribution utility, the net sum of . . . the former electric utility=s final fuel balance . . . and [the capacity-auction true-up amount].@ *Id.* ' 39.262(c).

Stranded costs and the final fuel balance are distinct concepts treated separately in the statute. If the legislature wanted to define an under-recovered fuel balance as a stranded cost it could have done so explicitly, or it could have easily included the impact of the final fuel reconciliation in the market valuation of a utility=s generation assets under section 39.262(c), (h), and (i). The fact that the legislature treated the fuel balance separately shows that it did not intend it to be a component of a stranded-cost calculation.

The same is true of the other true-up items. The capacity-auction true-up amount is the difference between the price the utility, or its unbundled power generation affiliate, was estimated to obtain for its power on the wholesale market in the second stage of stranded-cost recovery and the price the utility actually received during the first two years of competition. Although there is a closer nexus between this true-up item and the final determination of stranded costs, the legislature chose not to include this item in its definition of stranded costs or to incorporate it into the methods it prescribes for calculating stranded costs. Moreover, the legislature specifically mandated that this item be netted with the final fuel balance. *Id.* ' 39.262(d).

Chapter thirty-nine seems to contemplate two parallel true-up tracksCone for stranded costs and one for the several other true-up items. Separate portions of chapter thirty-

nine govern the effects that the calculations under each track are to have on rates. *Compare id.* ' 39.262(c), *with id.* ' 39.262(g). Although the calculation under each track can be applied to adjust the transmission and distribution utility=s nonbypassable rates, the utilities are authorized to securitize any remaining stranded costs but not positive balances associated with the other true-up items. *Id* ' 39.262(c). In some circumstances, performing two parallel true-up calculations, as the statute provides, and performing a single true-up calculation that nets stranded costs against all the true-up items, as the rule requires, would result in identical adjustments to rates. However, netting the stranded-cost calculation with the other true-up items can cause an impermissible offset of amounts due a utility whenever the market value of its generation assets exceed their book value, *i.e.*, when it has no stranded costs. *See generally id.* '' 39.252(a) (a utility is allowed to recover all its net verifiable stranded costs), .262(c)-(i) (contemplating two parallel true-up tracks).

We thus reject the Commission=s argument that the other true-up items represent stranded costs. We agree with the utilities that the statute does not contemplate a negative stranded-cost calculation and does not contemplate any consequence to ratepayers if the stranded-cost calculation produces a negative number. The rule that would net a negative stranded-cost calculation against a positive balance produced from the other true-up items is not authorized by the statute. Indeed, it directly contradicts the legislature=s intent that a positive stranded-cost calculation has significance while a negative calculation simply means that a utility is not entitled to recovery of stranded costs. By collapsing two parallel true-up tracks into a

combined calculation, the rule impermissibly allows a negative stranded-cost calculation to offset positive balances due from other true-up items. The statute does not require a utility to refund a negative calculation of stranded costs to ratepayers and the Commission may not require such a refund by calling these other true-up items stranded costs.

*Reversing Securitization Over-Recoveries*

We now turn to the Commission=s claim that even so, netting the calculations is a permissible means of preventing over-recovery of stranded costs by those utilities that received a windfall through securitization. When the legislature provided for mitigation and securitization of estimated stranded costs, it did so with the proviso that the Commission must ensure that no utility over-recover its stranded costs. *See id.* ' 39.262(a). The utilities that were estimated in the first stage to have stranded costs received substantial sums of money or its equivalent through mitigation and securitization proceeds. When the revised stranded-cost estimate showed that these utilities were likely to have no stranded costs, the Commission required the utilities to disgorge their mitigation proceeds through excess mitigation credits. As previously noted, however, the Commission could not reverse the transition charge imposed on ratepayers to finance the bonds that the utilities had sold. *See id.* ' ' 39.201(l)(1), .303(d).

When the legislature expressly confers a power on an agency, it also impliedly intends that the agency have whatever powers are reasonably necessary to fulfill its express functions or duties. *Public Util. Comm=n*, 53 S.W.3d at 316. Chapter thirty-nine requires the Commission to see that utilities do not *over-recover* their stranded costs. The Commission argues

that netting the various true-up items is a permissible way to prevent over-recovery C effectively forcing the utilities that sold transition bonds based on earlier invalid stranded-cost estimates to disgorge amounts to which they are not entitled.

While we agree with the Commission that it has the implied power to attempt to reverse over-recovery of stranded costs through netting, we find its rule to be overbroad. An agency may not exercise what is effectively a new power on the theory that such exercise is expedient for the agency=s purposes. *GTE-Southwest, Inc*., 901 S.W.2d at 407. The Commission=s rule does not limit the amount by which a negative stranded-cost calculation can offset other positive true-up balances to a utility=s previous over-recovery. *See* 16 Tex. Admin. Code. **'** 25.263(l). We hold that the Commission has the discretion to net a negative stranded-cost calculation against the other true-up items *only* to the extent that the utility over-recovered stranded costs through securitization.

For example, a utility that entered the first stage of stranded-cost recovery with generation assets having a book value of 3x and an estimated market value of 1x would have been required to mitigate or securitize estimated stranded costs of 2x. Assume that this utility sold transition bonds and removed 2x from its books, reducing its book value to 1x. If the market value of this utility=s generation assets has risen to 3x at the time of the true-up proceeding, the updated stranded-cost calculation will yield a negative 2x indicating that it has no actual stranded costs. But to the extent the book value was reduced by the proceeds of securitization, the utility appears to have over-recovered 2x when it received its bond proceeds. This is true because the

original book value of 3x would not have exceeded the increased market value of 3x, even had the utility never received bond proceeds of 2x. The full 2x would represent an over-recovery of stranded costs that the utility did not have. This amount, but no more, may be netted against other sums to prevent over-recovery.

The Commission must conduct parallel true-up calculations for stranded costs and the other true-up items. Only in those limited circumstances where a negative calculation of stranded costs results from the reduction of book value by securitization may the Commission devise a rule to offset any windfall received through securitization against the positive balance due the utility for the other true-up items. If a utility=s stranded-cost calculation would have been negative even if it had never sold transition bonds, then the full amount of its bond proceeds represents an over-recovery which can be netted against the other true-up items. On the other hand, if a utility would have had a positive stranded-cost calculation but for the fact that it sold the bonds, *i.e.*, if it would be entitled to recover stranded costs had it never reduced its book value through securitization, the Commission is limited to netting the amount by which the bond proceeds exceeded the actual stranded costs it would have recovered.[12]

_____

[12] The exact changes that the Commission makes to its rule to bring it into compliance with these principals are, of course, matters of discretion. The Commission could simply add a safety-valve provision which, for any utility, limits the amount by which a negative stranded-cost

calculation can offset other positive true-up balances to permissible amounts. Determining these permissible amounts at the true-up proceeding would not be difficult because it merely requires hypothetical adjustments to book value based on known information.

Reliant argues that it should not be required to disgorge any over-recovery it may have received through securitization. Its basic complaint seems to be that the Commission=s rule does not account for the fact that securitization substantially reduces the book value of a utility=s generation assets. We believe that our formulationCrequiring the Commission to consider what a utility=s stranded-cost calculation would have been absent securitizationCaddresses this concern.[13]

---

[13] Reliant claims that failure to take this reduction of book value into account causes the Commission to inaccurately catagorize the bond proceeds as an over-recovery. Reliant also argues that by netting the amounts that a utility received when it sold securitization bonds against other amounts it is due, the Commission accomplishes indirectly what it is directly prohibited from doing by statute. This argument is misconceived. Chapter thirty-nine makes securitization financing orders irrevocable and prohibits the Commission from adjusting the transition charges in order to assure payment to bondholders and allow the bonds to be issued on more favorable terms. *See* Tex. Util. Code. Ann. '' 39.301, .304, .306, .307 (West Supp. 2003). Transition charges flow to the bondholders to retire the transition bonds by paying all the principal and interest. *See id*.; *City of Corpus Christi*, 51 S.W.3d at 239. Nothing in chapter thirty-nine guarantees that a utility can keep bond proceeds to which it is not entitled.

In no circumstances may a negative stranded-cost calculation attributable to market conditions be netted against a positive fuel balance or other such true-up calculation. We sustain the challenge to the rule because it does not limit the netting of negative stranded-cost calculations to prevent over-recovery attributable to securitization. The Commission has the statutory authority to prevent over-recovery of stranded costs through securitization. It has no statutory authority to net negative stranded costs attributable to market forces.[14]

---

[14] In view of our disposition of this issue, we need not address the utilities= equal-protection arguments. *See* Tex. R. App. P. 47.1 (opinions must be as brief as practicable). Similarly, we do not specifically reference the arguments of the several intervenors on this issue because they do not differ materially from those of the Commission. *See id.* Throughout our opinion, we discuss the arguments of the intervenors only when they differ materially from those of the Commission.

*Partial Stock Valuation Method*

One of the Commission=s most important responsibilities during the true-up proceeding is to calculate the market value of a utility=s generation assets. *See generally* Tex. Util. Code Ann. ' 39.262(h). Chapter thirty-nine sets out several different methods that the Commission may use to make this calculation. *See id.* The utilities claim that the Commission exceeded its authority in promulgating portions of its rule that implement Athe partial stock valuation method.@ *See generally id.* ' 39.262(h)(3); 16 Tex. Admin. Code ' 25.263(f)(1)(C) (2002).

The Commission is authorized to use the partial stock valuation method to establish the value of generation assets when a utility has transferred some or all of those assets to affiliated or nonaffiliated corporations and between nineteen and fifty-one percent of the common stock of each such corporation is spun off and sold to public investors through a national stock exchange and traded for one year or more. *See* Tex. Util. Code Ann. ' 39.262(h)(3). The Commission is authorized to calculate the value of the assets held by the transferee corporation, presumably an unbundled power generation company, by adding the market value of its common stock to the book value of its preferred stock and its debt. *See id.*; *see generally* 16 Tex. Admin. Code ' 25.263(f)(1)(C)(viii).

A. <u>*Control Premium*</u>

The average daily closing price over thirty consecutive trading days, chosen by the Commission, with some constraints, is generally presumed to establish the market value of the

common stock.  *See* Tex. Util. Code Ann. ' 39.262(h)(3).  The Commission, however, is also authorized to convene a panel of financial experts to determine whether a control premium exists for the retained common stock.  *Id*.  A control premium is the additional value that a block of shares obtains by virtue of the fact that it carries with it the power to control the corporation.  *See Black=s Law Dictionary* 1200 (7th ed. 1999).  AThe control premium is often computed by comparing the aggregate value of the controlling block of shares with the cost that would be incurred if the shares could be acquired at the going market price per share.@ *Id*.

The utilities challenge the way that the control premium is calculated under the Commission=s rule.

Section 39.262(h)(3) of PURA specifically provides:

> The [C]ommission may accept the market valuation to conclusively establish the value of the common stock equity in each transferee corporation or convene a valuation panel of three independent financial experts to determine whether the percentage of common stock sold is fairly representative of the total common stock equity or whether a control premium exists *for the retained interest*. . . .  If the panel determines that a control premium exists *for the retained interest*, the panel shall determine the amount of the control premium, and the [C]ommission shall adopt the determination but *may not increase the market value by a control premium greater than 10 percent*.

Tex. Util. Code Ann. ' 39.262(h)(3) (emphasis added).  The Commission=s rule, however, provides:

> If the panel determines that a control premium exists for the retained interest, the panel shall determine the amount of the control premium, and the [C]ommission shall adopt the determination, *but may not use the control premium to increase the value of the assets by more than 10%.*

**16 Tex. Admin. Code ' 25.263(f)(1)(C)(v) (emphasis added).  The utilities argue that the statute only allows the Commission to apply the control premium to increase the value of the retained common stock equity by up to ten percent.  They claim that the rule is invalid because it instead allows the Commission to apply the control premium to increase by up to ten percent the value of all the corporation=s assets.[15]  The Commission responds that while the statute prohibits it from Aincreas[ing] the market value by a control premium greater than 10 percent,@**see **Tex. Util. Code Ann. ' 39.262(h)(3)**, the statute does not specify A[ten] percent@ of what and that we should defer to its interpretation.

We may not add words to a statute unless necessary to give effect to legislative intent. *Southwestern Life Ins.*, 24 S.W.3d at 583.  The Commission essentially asks us to add the words Aof all the corporation=s assets@ to the end of the statutory phrase Aby a control premium no greater than 10 percent.@  But the meaning of the phrase is unmistakable without such an addition.  Because a control premium represents value added to a retained block of shares, a Acontrol premium of ten percent@ would naturally increase the value of the retained block of shares by ten percent.  Similarly the phrase Aby a control premium no greater than 10 percent@ is limited to increasing the value of the retained block of shares by no

---

**[15]  As explained above, under the partial stock valuation method a corporation=s common stock represents only a portion of the total value of its assets.  *See* Tex. Util. Code Ann. ' 39.262(h)(3); 16 Tex. Admin. Code ' 25.263(f)(1)(C).  Of course, the retained portion of that stock represents an even smaller portion of the total value of its assets.  *See id.***

more than ten percent. We agree with the utilities that the Commission exceeded its authority by enacting the portion of its rule that would apply the control-premium cap to all of the corporation=s assets.

## B. AOther Admitted Evidence@

Reliant also complains that the rule impermissibly allows the Commission to second-guess the findings of the valuation panel. Chapter thirty-nine, **section 39.262(h)(3) requires a valuation panel consisting of three financial experts chosen from the top ten nationally recognized investment banks with demonstrated experience in the electric industry of the United States. Tex. Util. Code Ann. ' 39.262(h)(3). It then provides, A[i]f the panel determines that a control premium exists for the retained interest, the panel shall determine the amount of the control premium, and *the commission shall adopt the determination* [subject to the ten-percent cap].@ *Id.* (emphasis added). The statute further provides that Athe determination of the commission based on the finding of the panel conclusively establishes the value of the common stock in each transferee corporation.@ *Id.* Rule 25.263, however, states that the Commission is to determine the value of the common stock of the transferee corporation Abased on the findings of the Commission and *other admitted evidence*.@ *See* 16 Tex. Admin. Code 25.263(f)(1)(C)(vii) (2002) (emphasis added).**

**The Commission argues that the language Aother admitted evidence@ was intended only to allow for consideration of evidence relating to issues other than the panel=s substantive finding, such as the Commission=s obligation to reduce any control premium by ten percent, or to ensure that the panel was properly constituted in accordance with the statute. *See* Tex. Util. Code**

Ann. ' 39.262(h)(3). It claims that if the rule is applied in a way that fails to respect the panel=s determination, the proper place to challenge it is at the true-up proceeding.

By requiring that the Commission Ashall adopt@ the panel=s control-premium determination, the legislature signaled its intent that the valuation of the panel be conclusive. The extra-statutory language of the rule, *as written*, allows the Commission to consider whatever evidence it chooses to increase the value of the common stock. The Commission cannot simply confer this authority on itself without legislative approval. *See Ford Motor Co. v. Motor Vehicle Bd.* 21 S.W.3d 744, 764 (Tex. App.C Austin 2000, pet. denied) (an agency Amay not, on a theory of necessary implication from a specific power, function, or duty expressly delegated, erect and exercise a new or additional power or a power that contradicts the statute@).

The Commission is also wrong to contend that Reliant=s complaint is not properly brought as a validity challenge. It cannot promulgate a rule granting to itself a power in contradiction of its legislative mandate, and then claim that because it intends to interpret the rule narrowly that the issue is somehow one of application and not validity. We sustain the challenge to this portion of the rule.[16]

---

[16] Intervenors TIEC, SCC, and OPUC argue that the challenged portion of the rule is valid because the Commission can choose not to convene a valuation panel at all, in which case it must consider Aother admitted evidence@ in order to determine market value. They argue that, in light of this discretion, the statutory requirement that the Commission=s determination be Abased on the finding of the panel@ means only that the panel=s determination is to provide a basis, but not necessarily the sole basis, for the Commission=s interpretation. We disagree. The challenged portion of the rule only applies if the Commission chooses to convene a valuation panel. Moreover, the statute is clear that when a panel is convened, its determination is to be conclusive. *See* Tex. Util. Code. Ann. ' 39.262(h)(3). On the intervenors= interpretation, the

*Interest*

A utility found to have stranded costs at the true-up proceeding must either securitize those costs or recover them over time through nonbypassable rates. *See* Tex. Util. Code Ann. ' 39.262(c); 16 Tex. Admin. Code ' 25.263(l)(2)(A) (2002). For a utility that does not securitize its stranded costs, full recovery may take a number of years. Rule 25.263 provides that if a utility is found to have stranded costs at the true-up proceeding, then its unbundled transmission and distribution affiliate Ashall be allowed to recover . . . carrying costs [*i.e.*, interest] on the true-up balance.@ *See* 16 Tex. Admin. Code ' 25.263(l)(3) (2002). Because of the time value of money, this interest represents a portion of the Anet, verifiable, nonmitigable stranded costs@ that the utility is entitled to recover under chapter thirty-nine. *See generally* Tex. Util. Code Ann. ' 39.252(a). The rule further provides that interest shall be calculated from the date that the final true-up order is issued until stranded costs are fully recovered. *See* 16 Tex. Admin. Code ' 25.263(l)(3).

---

requirement that the Commission=s determination be Abased on the findings of the panel@ would be superfluous given the fact that it follows a requirement that the Commission Ashall adopt@ the panel=s determination. *See Texas Workers=Compensation Ins. Fund v. Del Industrial, Inc.*, 35 S.W.3d. 591, 593 (Tex. 2000) (AA cardinal rule of statutory construction is that each sentence, clause and word is to be given effect if reasonable and possible.@).

The utilities argue that the rule=s provision for interest is deficient. They claim that interest should be calculated to accrue from January 1, 2002, the first day of competition, because this is when costs became Astranded.@ The Commission rejoins that stranded costs do not magically arise on the first day of competition, but, for purposes of stranded-cost recovery under chapter thirty-nine, come into existence only after the true-up proceeding. We agree with the Commission.

The true-up proceeding determines whether a utility has any actual stranded costs. *See* Tex. Util. Code Ann. ' 39.201(l), .262(c). At that time, the Commission is to determine a utility=s stranded costs by comparing the market value of the utility=s generation assets with their book value. The utilities attach some significance to the fact that the stranded-cost calculation is to use the book value of December 31, 2001Cthe last day of regulation. *See* Tex. Util. Code Ann. ' 39.251(7). They contend that this indicates that the true-up proceeding actually determines the amount of stranded costs that existed on the first day of competition. This contention is false. While the book value to be used by the Commission at the true-up proceeding is to be determined as of December 31, 2001, its calculations are to be based on the market value as determined in the proceeding. *See id.* ' 39.262(h). This market value may fluctuate widely between the first day of competition and the date of the true-up proceeding. Moreover, a formerly regulated utility enters the first day of competition with its preexisting customer base intact, *i.e.*, the utility=s affiliated retail electric provider inherits the retail customers in the former utility=s service area.

**In the first few years of competition C before the 2004 true-up proceeding C a utility can take steps to increase the market value of its generation assets by simply participating in the market.**[17]

That the legislature chose the last day of regulation as the day for measuring book value is inconsequential. After competition is introduced, a utility no longer accrues Abook value,@ because such a concept is meaningless outside of the former regulatory system. We reject the utilities= argument that their actual stranded costs all accrued on the first day of competition.

---

[17] For example a utility may upgrade a plant or successfully renegotiate an above-cost fuel contract. *Cf*. Tex. Util. Code Ann. ' 39.251(7) (requiring that Aabove market purchased power costs@ be considered in any stranded-cost calculation).

Reliant makes an additional argument that interest on at least a portion of its recoverable stranded costs should accrue from the first day of competition. It claims that A[t]o the extent Reliant . . . has stranded costs in 2004, the Commission=s 2001 stranded-cost estimates [which resulted in reversal of Reliant=s earlier mitigation efforts] will have been incorrect@ and Reliant will have been deprived of the opportunity to recover its stranded costs through early mitigation. *See generally* Tex. Util. Code Ann. '' 39.201(d)-(l), .254, .256. It therefore contends that interest on any stranded costs attributable to reversed mitigation should accrue from the time that it is required to issue excess mitigation credits. This argument lacks merit. The duty to utilize the statute=s mitigation procedures was predicated on stranded-cost *estimates*, *see id.*, and a utility=s right to fully recover its stranded costs does not encompass a right to early mitigation.[18] *See id.* 39.252(a).

AEP also argues that providing for interest to accrue only from the date of the final order is arbitrary and capricious because orders affecting different utilities will likely be issued on different dates. This argument also lacks merit. Normal Aregulatory lag@ is considered to be an element of risk borne by a utility. *See State v. Public Util. Comm=n*, 883 S.W.2d. 190, 196 (Tex. 1994). The utilities therefore are not entitled to revenues lost due to the time it takes to conduct the true-up proceeding.

---

[18] We also reject Reliant=s claim that interest on the capacity auction true-up amount should accrue from the first day of competition. We have held that the capacity auction true-up amount is not a component of stranded costs.

35

**We overrule the utilities= issues challenging section 25.236(l)(3) of the Commission=s competition rule and hold that the Commission=s provision for interest is adequate to provide the utilities with full recovery of their stranded costs.**

*Failure to Reduce Potential Stranded Costs*

Because recoverable stranded costs are determined according to the market value of generation assets as measured in the 2004 true-up proceeding, any move that increases the market value of these assets before the true-up proceeding will potentially reduce a utility=s stranded-cost recovery. For utilities with significant unrecovered book value there will be no competitive-market incentive to maintain or increase the market value of their assets until after the true-up proceeding.

Chapter thirty-nine addresses this lack of market incentive by creating a statutory incentive. It provides that utilities are only allowed to recover stranded costs that are Anonmitigable,@ *see* Tex. Util. Code Ann. ' 39.252(a), and requires Aan electric utility . . . [to] pursue commercially reasonable means to reduce its potential stranded costs, including good faith attempts to renegotiate above-cost fuel and purchased power contracts or the exercise of normal business practices to protect the value of its assets.@ *See id.* ' 39.252(d). To enforce this requirement the legislature mandated that Athe [C]ommission shall consider the utility=s efforts under this subsection when determining the amount of the utility=s stranded costs; provided, however, that nothing in this section authorizes the [C]ommission to substitute its judgment for a market valuation of generation assets determined under Sections 39.262(h) and (i).@ *Id.*

Rule 25.263(e)(4) implements this section. It provides that the Commission will determine at the true-up proceeding whether the utility, through its unbundled successor affiliates, has pursued

commercially reasonable means to reduce its stranded costs.  It further provides that if the [C]ommission finds that a utility=s successor affiliates Ahave failed, individually or in combination, to fully comply with their obligations under PURA ' 39.252(d), the [C]ommission may reduce the net book value of the . . . [affiliated power generation company=s] generation assets or take other measures it deems appropriate in the true-up proceeding filed under this section.@ *See* 16 Tex. Admin. Code ' 25.263(e)(4) (2002).

AEP and Reliant each challenge this portion of the rule, but on different grounds.  AEP claims that a utility=s duty to reduce its potential stranded costs ended once it unbundled into successor affiliates, while Reliant argues that the Commission lacks the authority to reduce the book value of generation assets.  We reject both arguments.

AEP claims that unbundled power generation companies and retail electric providers are not required to reduce their potential stranded costs.  It argues that these successor affiliates have no such duty because section 39.252(d) imposes the duty on A[a]n electric utility@ and PURA=s general definition of electric utility specifically excludes power generation companies and retail electric providers.  *See* Tex. Util. Code Ann. ' 31.002(6).  This argument cannot survive close scrutiny because it requires us to construe portions of the statute in isolation and would lead to absurd results.  ***See Southwestern Life Ins., 24 S.W.3d at 583-85.***

Section 39.252(a) grants the right to recover stranded costs to Aan electric utility.@ Tex. Util. Code Ann. ' 39.252(a).  Section 39.252(d) imposes the duty to pursue commercially reasonable means to reduce potential stranded costs on Aan electric utility,@ and requires the commission to consider Athe utility=s@ efforts when determining the amount of stranded costs, *i.e.*, when conducting the true-up proceeding.  *Id.* '

39.252(d). These subsections all affect the stranded-cost calculation to take place at the true-up proceeding. Yet at the true-up proceeding, "an electric utility" is to collect its stranded costs through its successor affiliates. *See id.* ' 39.262(c) ("... each transmission and distribution utility, its affiliated retail electric provider, and its affiliated power generation company shall jointly file to finalize stranded costs . . . ."). The "electric utility=s" stranded costs are calculated according to the market value of the generation assets owned by its successor power generation company. *See id.* ' 39.262(h), (i). It is apparent from these sections that when the legislature was discussing stranded-cost recovery it sometimes used the term "electric utility" to refer to an integrated utility=s successor affiliates.

Moreover, AEP=s reading would lead to absurd results. As discussed above, section 39.252(d) imposes on an electric utility the statutory duty to try to reduce stranded costs as a substitute for market incentive. As discussed above, until the true-up proceeding, no utility with significant book value will have any market incentive to increase or maintain the value of its generation assets because any move to do so will correspondingly reduce its stranded-cost recovery. The unbundling of a utility into successor affiliates does not affect this lack of incentive. We decline to attribute to the legislature the intent to make such an arbitrary distinction.

Reliant attacks the rule on another basis. The rule allows the Commission to reduce the book value of a utility=s generation assets if its successor affiliates have not pursued commercially reasonable means to reduce potential stranded costs. *See* 16 Tex. Admin. Code ' 25.263(e)(4) (2002). According to Reliant, the legislature=s "obvious purpose" in prohibiting the Commission from substituting its judgment for the market valuation of generation assets is to ensure that the true-up calculation yields an accurate

stranded-cost number. Reliant argues that by allowing the Commission to adjust book value, the rule circumvents the statutory goal of calculating an accurate stranded-cost amount. We disagree.

We note initially that the relevant statutory goal is not calculating an accurate stranded-cost amount, but calculating an accurate Averifiable, *non-mitigable* stranded cost[]@ amount. Tex. Util. Code Ann. ' 39.252(a) (emphasis added). Compliance with the duty to pursue commercially reasonable means to mitigate its potential stranded costs is part of what makes stranded costs non-mitigable. *See id.* ' 39.252(a), (d). Reliant=s interpretation is likely to yield inaccurate determinations of non-mitigable stranded costs.

Nothing in the statute explicitly prohibits the Commission from reducing a utility=s book value if it finds that it or its successor affiliates have failed to comply with their obligation to attempt to reduce stranded costs. In fact, the statute implies that just such an adjustment should take place. As noted, section 39.252, subsection (d) requires the Commission to consider a utility=s attempts to comply with this obligation when determining a utility=s stranded costs at the true-up proceeding. *See id.* ' 39.252(d). Because this same subsection further provides that the Commission is prohibited from adjusting the market value of the generation assets as determined under section 39.262(h) and (i), *see id*, it impliedly contemplates some sort of adjustment to book valueCthe only other component of stranded costs. We overrule the utilities= challenge to section 25.263(e)(4) of the Commission=s rule.

**CONCLUSION**

The Commission erred in promulgating that portion of its rule which unqualifiedly allows a negative stranded-cost calculation to offset other amounts a utility may become entitled to at the true-up

proceeding. The statutory duty to see that a utility does not over-recover its stranded costs justifies netting a negative stranded-cost number against the other true-up amounts only to the extent that it reverses an actual over-recovery due to securitization. The Commission also erred in promulgating those portions of its rule which, in setting out the partial stock valuation method, (1) allow it to apply the ten-percent control-premium cap to the value of all corporate assets, and (2) allow it to second-guess the valuation of the panel by considering other admitted evidence. We reverse these portions of the rule and remand them to the Commission for further proceedings consistent with this opinion. We find the other challenged portions of the rule to be valid and uphold them as enacted.

## ON REHEARING

The utilities filed motions for rehearing asking that we clarify certain portions of our opinion and substantively change other portions. We grant the motions for purposes of clarification only and substitute modified pages. We overrule the motions insofar as they request that we change our holding. Our opinion and holding remain substantively unchanged.

Bea Ann Smith, Justice

Before Justices Kidd, B. A. Smith and Yeakel

Affirmed in Part; Reversed and Remanded in Part

Filed:   February 6, 2003

**40**