IN THE SUPREME COURT OF TEXAS









IN THE SUPREME COURT OF TEXAS

 

════════════

No. 03-0396

════════════

 

CenterPoint Energy, Inc.
f/k/a Reliant Energy, Incorporated

and American Electric Power
Company, Inc., Petitioners

 

v.

 

Public Utility Commission of
Texas, Respondent

 

════════════════════════════════════════════════════

On Petition for Review from the

Court of Appeals for the Third District of
Texas

════════════════════════════════════════════════════

 

 

Argued
February 18, 2004

 

 

Justice Brister, joined by Chief
Justice Phillips, Justice
Schneider and Justice Smith,
dissenting.

 

 

As a part of electricity-market deregulation, the
Legislature allowed existing utility companies to recover stranded costs C but no more.  The Legislature said nothing about
interest.  Nevertheless, the Court holds
utilities are potentially entitled to billions[1] of
dollars in interest (to be collected from consumers through higher prices)
because any other rule is Ainconsistent@ with the statute.[2]  I do not see how an order refusing to grant interest
is inconsistent with a statute that says nothing about interest; thus, I
respectfully dissent.

In preparation for the third and final stage of
the transition to competition in the electric industry, the Legislature
directed the Public Utility Commission to establish procedures for a Atrue-up proceeding@ to be conducted in 2004.[3]  The Commission conducted hearings and drafted
a rule.[4]  Petitioners CenterPoint
Energy and American Electric Power Company challenged several aspects of the
rule in the Third Court of Appeals, which invalidated some parts of the rule
and affirmed others.[5]  Only the utilities appeal, and only on one
point C the
validity of a rule providing for interest on stranded costs after the 2004
true-up proceedings, but not before. 

Stranded costs represent the costs of building and
operating an electric power plant that would have been recoverable under
regulation, but are unlikely to be recoverable in a competitive market.[6]  The statute provides that a utility Ais allowed to recover all of its net,
verifiable, nonmitigable stranded costs.@[7]  If the Commission finds a utility has
stranded costs at the true-up proceedings in 2004, the utility=s transmission and distribution
affiliate (the remaining regulated entity) may recover them over a period of
years through rates assessed to all consumers.[8]  

The statute does not say whether interest should
run on stranded costs until they are recovered, and if
so from when.  The Commission concedes a
utility would not recover Aall@ of its stranded costs if interest does
not run from the true-up forward.[9]  The utilities, of course, heartily agree.

But the utilities argue the Commission violated
the statute by not providing for additional interest from January 1, 2002 (when
competition started) until the true-up. 
For several reasons, I disagree.

First, the deregulation statute never mentions
interest.  I find it difficult to say the
Commission violated the statute by failing to do something the statute never
mentions.  

Second, the sole provision of the statute on which
the utilities rely is stated in permissive rather than mandatory terms:

An
electric utility is allowed to recover all of its net, verifiable, nonmitigable stranded costs incurred in purchasing power
and providing electric generation service.[10]

 

The focus of this section (entitled ARight
to Recover Stranded Costs@)
is not on making sure the Commission gives utilities their due, but on making
sure customers do not avoid stranded cost recovery by switching to a new
provider[11]
or new on‑site generation.[12]

Third, the statute allows for recovery only of
stranded costs that are Averified@ and Anonmitigable.@  The Legislature provided that stranded costs
were to be mitigated (so far as possible) before the true-up proceedings, and
verified during them.[13]  Before 2004, stranded costs could not be
verified, and still had to be mitigated. 
Thus, during 2002 and 2003, they were neither Averified@ nor Anonmitigable.@  

Fourth, even if the statute is ambiguous regarding
interest, the Commission=s
interpretation is entitled to Agreat
weight@ as long
as it is reasonable and does not conflict with the statute=s language.[14]  As the statute does not require interest, the
Commission=s
interpretation is both reasonable and non-conflicting.  

There are several reasons the Legislature may have
chosen not to make consumers pay interest on the utilities= stranded costs between 2002 and
2004.  In the first place, the statute
provided a number of tools for utilities to mitigate stranded costs beginning
in 1999, several years before competition began in 2002.[15]  Any interest the utilities might have lost on
stranded costs during 2002 and 2003 must be balanced against their opportunity
to earn a return on stranded costs recovered in 1999, 2000, and 2001 B almost two-and-one-half years
before even the utilities claim stranded costs came into existence.  Presumably, a utility=s
decision on when and how to mitigate stranded costs was based on what would
bring the best return on its investments; it is hard to see why ratepayers
should pay interest as an additional return on an investment option they chose
not to make.

Second, calculations of stranded costs for 2002
and 2004 are both estimates based on formulas mandated by statute.[16]  The Court presumes that an estimate of $5
million in stranded costs in 2004 would Aconfirm@ whether the earlier estimate was a Agood predictor@
or not.  But both estimates were based on
current data (gas prices, electricity prices, stock prices, interest
rates, and so on) that could vary on a daily basis.  A $5 million estimate of stranded costs in
2004 does not mean the estimate of stranded costs should have been the same for
2002, any more than rain today means yesterday=s
forecast of a 50% chance of showers was too low.  By requiring interest backward from 2004, the
Court overrides the formula the Legislature mandated for calculating rates in
2002 and 2003.[17]

CenterPoint argues
interest must be paid on stranded costs from 2002 because they came into
existence when competition began.  But
the concept of Astranded
costs@ is
entirely a regulatory accounting construct C
it is impossible to say when such a concept comes into Abeing@ in any existential sense.  Of course, if the cost of building a nuclear
power plant cannot be recovered in a competitive market, the loss suffered by
investors is certainly real.  But that
loss cannot be known until the last kilowatt is sold, and no one suggests waiting
until then.

Accordingly, the stranded costs that will be paid
to utilities are those created by the statute, and should be paid when and to
the extent the statute provides.  The
Legislature recognized that any estimate of stranded costs might vary widely
and continue to do so for many years. 
Nevertheless, the Legislature provided for a final determination of
stranded costs during the 2004 true-up proceedings.  The figures assessed then will be final, even
if subsequent decades show they were too high or too low.  As the Legislature designated one date for
when stranded costs are determined, the Commission might reasonably have
decided interest should only run from then.

CenterPoint argues that
stranded costs should be treated like a jury verdict C
though the amount of damages is not calculated until the jury does so, prejudgment interest nevertheless runs from the original
occurrence.  In the first place, we are
not at liberty to decide the question before us on equitable principles, as we
originally did with respect to prejudgment interest.[18]  We play a more limited role when reviewing a
statute and an administrative rule than we do when developing common-law
remedies.

Moreover, with stranded costs, a more apt analogy
would be a system in which a jury returns a different verdict every day
for a period of years, each one very different from the verdict the day before,
and each one correct.  In such a system,
it would be difficult to say what principal amount should be used to calculate
interest.  There would also be
substantial costs involved in calculating stranded costs so often.  

Instead, the Legislature provided for a single
definitive determination at the 2004 true-up proceedings, a somewhat arbitrary
date that no party challenges, and that (depending on circumstances yet to
occur) may operate to the benefit or detriment of utilities or consumers.  Given the statute=s
clear designation of when stranded costs are finally determined, and its
silence regarding interest, the Commission=s
rule is both reasonable and consistent with the statute, and thus entitled to
our deference.

In a government of separated powers, it is not our
role to decide whether paying interest to utilities during 2002 and 2003 would
be wise, or fair, or what we would do in similar circumstances.  We can decide only whether the Commission
violated the deregulation statute by providing for interest from the 2004
true-up forward.  Because the statute is
silent on the matter, I would hold it did not.

 

 

 

______________________________________

Scott Brister

Justice

 

 

OPINION
DELIVERED: June 18, 2004











[1] CenterPoint asserts in its
petition for review that it alone would lose $1 billion in interest on stranded
costs between 2002 and the true-up proceeding in 2004.





[2] ___ S.W.3d ___.





[3] Tex. Util. Code ' 39.262(c).  





[4] 16 Tex. Admin. Code ' 25.263.





[5] 101 S.W.3d 129, 149-50.





[6] See Tex.
Util. Code ' 39.251(7); In re TXU Elec. Co., 67 S.W.3d 130,
132 (Tex. 2001) (Phillips, C.J., concurring).





[7] Tex. Util. Code ' 39.252(a).





[8] See id. ' 39.262(c).





[9] 16 Tex. Admin. Code '
25.263(l)(3).





[10] Tex. Util.
Code ' 39.252(a) (emphasis added). 





[11] Id. '
39.252(c).





[12] Id. '
39.252(b).





[13] See generally id. ' 39.254-.262.





[14] State v. Pub.
Util. Comm'n of Tex., 883 S.W.2d 190, 196 (Tex.
1994); see also Osterberg v. Peca, 12 S.W.3d
31, 51 (Tex. 2000) (giving Agreat weight@ to
Texas Ethics Commission=s interpretation).





[15] See Tex.
Util. Code '' 39.201(i)(1)
(allowing securitization of up to 75% of stranded costs), 39.254 (requiring
earnings in excess of the allowed rate of return to be applied to stranded
costs), 39.256(a) (allowing redirection of transmission asset depreciation); see
generally ' 39.254 (requiring utilities to use mitigation tools).





[16] See id. '' 39.201(h), 39.262(i).  Neither calculation would be an estimate to
the extent the underlying stranded costs (power-generation assets, primarily
nuclear power plants) were sold, see id. '
39.262(h)(1), but there is no indication in our record
that such plants have changed hands.





[17] See id. 39.201(h).  The statute provided for adjustment of
rates at the 2004 true-up to provide recovery of stranded costs, but did not
require reimbursement of interest if the 2001 estimates were lower or
higher.  Id. ' 39.262(g) (AIf the
commission determines that the nonbypassable delivery
rates are not sufficient, the commission may extend the original collection
period for the [CTC] charge or, if necessary, increase the charge.@).





[18] See Cavnar
v. Quality Control Parking, Inc., 696 S.W.2d 549, 552 (Tex. 1985), superseded
by Tex. Fin. Code ' 304.102.