# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00698-CV

**Appellants, Office of Public Utility Counsel and Texas Industrial Energy Consumers// Cross-Appellant, Public Utility Commission of Texas**

**v.**

**Appellee, Public Utility Commission of Texas// Cross-Appellees, Office of Public Utility Counsel and Texas Industrial Energy Consumers**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT NO. D-1-GN-08-000476, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING**

---

## O P I N I O N

The Office of Public Utility Counsel ("OPC") and Texas Industrial Energy Consumers ("TIEC") sought judicial review of the decision of the Public Utility Commission ("the Commission") in a generic administrative proceeding instigated for the purpose of determining whether statewide stranded costs exceeded $5 billion and, if necessary, reallocating costs in excess of $5 billion among the various classes of customers. The trial court affirmed the Commission's decision in part, but remanded a single issue related to environmental retrofit costs back to the Commission to allow for the presentation of additional evidence. OPC and TIEC now appeal from the trial court's order to the extent it affirms the Commission's order. The Commission cross-appeals, asserting that the trial court erred in remanding the issue of environmental retrofit costs. We affirm that portion of the trial court's order affirming the Commission's decision. Because we

conclude that the trial court erred in remanding the issue regarding environmental retrofit costs back to the Commission, we reverse that portion of the trial court's order and affirm the Commission's decision.

**BACKGROUND**

*Deregulation*

In 1999, the legislature initiated the deregulation of the Texas electricity market, providing for the transition from a regulated industry to a competitive deregulated market. *See* Act of May 27, 1999, 76th Leg., R.S., ch. 405, 1999 Tex. Gen. Laws 2543 (current version at Tex. Util. Code Ann. §§ 39.001-.916 (West 2007 & Supp. 2009)); *see generally CenterPoint Energy Houston Elec., LLC v. Gulf Coast Coalition of Cities*, 252 S.W.3d 1, 7-12 (Tex. App.—Austin 2008, pet. granted) (describing deregulation). As part of the deregulation process, formerly regulated utilities were allowed to recover their investments made in generation assets, such as nuclear power plants, that would generally not be recoverable in a competitive market. *See CenterPoint*, 252 S.W.3d at 8; *see also* Tex. Util. Code Ann. § 39.001(b)(2) (finding that it is in the public interest to "allow utilities with uneconomic generation-related assets . . . to recover the reasonable excess costs over market of those assets"). Utilities were authorized to recover these "stranded costs" by allocating and collecting them from the residential, commercial, and industrial classes of customers according to certain allocation factors created by the legislature. *See* Tex. Util. Code Ann. §§ 39.252 (right to recover stranded costs), 39.253 (allocation of stranded costs). The administrative proceeding giving rise to this appeal dealt primarily with issues related to the proper allocation of stranded costs among the customer classes for purposes of collection.

2

*Stranded Cost Allocation Methodology*

According to the applicable stranded cost allocation methodology, industrial and commercial customers are allocated stranded costs based solely on what the parties refer to as production demand allocation factors ("PDAFs").[1]  *See id.* § 39.253(d), (e).  With respect to residential customers, 50% of stranded costs allocated to this class of customers are allocated on the basis of PDAFs, while the remaining 50% are allocated on the basis of energy consumption.  *See id.* § 39.253(c).  Because residential customers typically bear a greater share of costs when allocation is based on PDAFs, and a lesser share of costs when allocation is based on consumption, the effect of section 39.253(c) is that residential customers are allocated less of the stranded cost burden than they would have been if 100% of stranded costs were allocated using PDAFs.  However, once "total retail stranded costs" exceed $5 billion on a statewide basis, those stranded costs in excess of $5 billion are to be allocated to residential customers based solely on PDAFs.  *See id.* § 39.253(f).  As a result of section 39.253(f), residential customers are allocated a higher share of those statewide retail stranded costs that exceed $5 billion.

*Generic Reallocation Proceeding: Docket 32795*

In the years after deregulation, the Commission conducted a series of true-up proceedings in order to quantify the stranded costs of each deregulated utility and implement the recovery of stranded costs from the customer classes within each utility's service area.  Until all of

---

[1]  According to testimony in the administrative proceeding, PDAFs represent the allocation factors originally used to allocate the underlying generation assets that were the subject of stranded cost recovery.

3

the true-up proceedings were completed, the Commission could not determine total statewide retail stranded costs and therefore could not determine how much, if any, of the stranded costs should have been allocated using the methodology required by section 39.253(f) for statewide stranded costs in excess of $5 billion. In the interim, the Commission allocated all stranded costs using the methodology described in section 39.253(b)-(d). Upon completion of all true-up proceedings, the Commission's staff filed a petition to initiate a generic proceeding to reallocate stranded costs pursuant to section 39.253(f). This petition resulted in Docket 32795, the administrative proceeding giving rise to this appeal.[2]

The Commission was faced with two primary issues in Docket 32795. First, it had to determine whether total statewide retail stranded costs exceeded $5 billion. Second, to the extent statewide retail stranded costs *did* exceed $5 billion, the Commission had to reallocate stranded-cost recovery among the customer classes in order to ensure that the allocation complied with section 39.253(f).

Shortly after the initial petition was filed in Docket 32795, the case was referred to the State Office of Administrative Hearings (SOAH). After reviewing the evidence, conducting a hearing, and accepting post-submission briefs, the SOAH administrative law judges issued a proposal for decision. The Commission considered the proposal and then issued an order remanding the case back to SOAH for the resolution of a specific list of questions. The administrative law judges issued a new proposal for decision on remand, which was ultimately adopted by the Commission in its final decision.

---

[2] Docket 32795 had no effect on the amount of stranded costs that the utilities were authorized to recover, but affected only the allocation of stranded costs among the customer classes.

In its final order, the Commission determined that statewide retail stranded costs totaled approximately $6.029 billion, necessitating a reallocation of the $1.029 billion in stranded costs that exceeded the $5 billion threshold. In calculating total statewide retail stranded costs, the Commission refused TIEC's request to include (1) interest that accrued on stranded costs prior to their recovery or (2) up-front qualified costs incurred in securitizing stranded costs. The Commission also declined, over objections from OPC, to reduce the total amount of statewide retail stranded costs by what the parties refer to as the accumulated deferred federal income tax ("ADFIT") benefit, a financial benefit enjoyed by the utilities as a result of differing depreciation methods for tax and regulatory purposes. Finally, while OPC requested that the Commission adjust the amount of total statewide retail stranded costs to reflect a potential refund for unused environmental retrofit costs that was likely to result from an ongoing administrative proceeding with a particular utility, the Commission denied this request on procedural grounds.

The Commission ordered that the $1.029 billion in statewide retail stranded costs exceeding $5 billion be reallocated as required by section 39.253(f), and further ordered a retroactive reconciliation of those stranded costs that each utility had already collected from ratepayers, with interest on the reconciled amounts to be paid by the residential customers to the other customer classes.

TIEC and OPC each sought judicial review of the Commission's decision, and the cases were consolidated. The trial court affirmed the Commission's order, with the exception of its refusal to consider evidence related to the potential refund for unexpended environmental retrofit costs. The trial court remanded the issue of environmental retrofit costs back to the Commission to allow OPC to present additional evidence. Both TIEC and OPC appealed the trial court's order to

the extent it affirmed the Commission's decision, and the Commission cross-appealed the order of remand.

On appeal, TIEC argues that the trial court erred in affirming the Commission's order because (1) interest on stranded costs should have been included in the calculation of total statewide retail stranded costs, (2) up-front qualified costs should have been included in the calculation of total statewide retail stranded costs, and (3) the interest rate that the Commission applied to reconciled stranded costs was not supported by substantial evidence. OPC, on the other hand, argues that (1) the amount of statewide retail stranded costs should have been reduced to reflect the ADFIT benefit, (2) the stranded costs already collected from ratepayers should not have been retroactively reconciled to reflect the allocation methodology required by 39.253(f), and (3) even if retroactive reconciliation was proper, residential customers should not have been required to pay any interest on the reconciled amounts. In a single issue on cross-appeal, the Commission argues that the trial court erred in remanding the issue of environmental retrofit costs back to the Commission for the presentation of additional evidence.

## STANDARD OF REVIEW

In general, courts review final orders of the Commission under the substantial-evidence rule. *See* Tex. Util. Code Ann. § 15.001 (West 2007); Tex. Gov't Code Ann. § 2001.174 (West 2008). Under the substantial-evidence rule, the Commission's decision must be affirmed as long as some reasonable basis for the decision exists in the record. *See Cities of Abilene, San Angelo, & Vernon v. Public Util. Comm'n*, 146 S.W.3d 742, 748 (Tex. App.—Austin 2004, no pet.) ("[W]e are prohibited from substituting our judgment for the agency's as to the weight of the evidence on questions committed to agency discretion.").

6

Issues on appeal that turn on questions of statutory construction are reviewed de novo. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). "Construction of a statute by the administrative agency charged with its enforcement is entitled to serious consideration, so long as the construction is reasonable and does not contradict the plain language of the statute." *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993).

Finally, procedural issues related to an agency's administrative docket are reviewed for an abuse of discretion by the agency. *See Meier Infiniti Co. v. Motor Vehicle Bd.*, 918 S.W.2d 95, 101 (Tex. App.—Austin 1996, writ denied) (applying abuse-of-discretion standard to issue of whether Board erred in not granting party's motion to reopen evidentiary hearing, noting that agency decisions "on matters involving the agency's administrative docket are within the discretionary control of the hearing officer").

## DISCUSSION

*Calculation of Statewide Retail Stranded Costs: Interest on Stranded Costs*

TIEC asserts that in calculating total statewide retail stranded costs, the Commission should have included the interest, or carrying costs, awarded to the deregulated utilities on their stranded cost recovery. TIEC takes the position that interest on stranded costs is itself a stranded cost, and therefore that the Commission erred in failing to count approximately $1 billion in interest toward the calculation of total statewide retail stranded costs.

In support of its position, TIEC relies on certain statements made by this Court and the Texas Supreme Court in opinions involving the recovery of interest on stranded costs. In *Reliant Energy, Inc. v. Public Util. Comm'n*, 101 S.W.3d 129 (Tex. App.—Austin 2003), *rev'd in part sub nom.*, *CenterPoint Energy v. Public Util. Comm'n*, 143 S.W.3d 81 (Tex. 2004), the deregulated

7

utilities brought a challenge to Commission rule 25.263(*l*)(3), which at that time provided that utilities may recover interest on stranded costs, but only from the date of the utility's true-up final order. *See* 26 Tex. Reg. 10498 (2001), *amended* 28 Tex. Reg. 5993 (2003), *amended* 31 Tex. Reg. 5603 (2006). In challenging former rule 25.263(*l*)(3), the deregulated utilities argued that they should be able to recover interest on stranded costs from the date competition began on January 1, 2002. *See Reliant*, 101 S.W.3d at 146. In reviewing the utilities' rule challenge, we described the purpose of allowing utilities to recover interest on stranded costs by stating, "Because of the time value of money, this interest represents a portion of the 'net verifiable, nonmitigable stranded costs' that the utility is entitled to recover under chapter thirty-nine." *Id.* We then went on to agree with the Commission that such interest should be calculated from the date of the true-up final order. *Id.*

The Texas Supreme Court subsequently determined that our opinion in *Reliant* did not allow utilities to collect a sufficient amount of interest on their stranded costs, holding instead that utilities should be able to recover interest from the date competition began on January 1, 2002. *See CenterPoint Energy v. Public Util. Comm'n*, 143 S.W.3d 81, 84 (Tex. 2004). In reaching this conclusion, the supreme court stated, "A two- or three-year gap in recovery of carrying costs would not permit generation companies full recovery of their stranded costs as the Legislature envisioned." *Id.*

To support its argument that interest on stranded costs is itself a stranded cost, TIEC relies on the statements quoted above from *Reliant* and *CenterPoint*. However, it is not inconsistent to consider interest on stranded costs to be separate and distinct from stranded costs, while also stating, as this Court and the supreme court did in *Reliant* and *CenterPoint*, that utilities must be able

to recover interest in order to fully recover stranded costs. As we noted in *Reliant*, the concept of the time value of money necessarily precludes a utility from fully recovering its stranded costs if it does not also recover interest—not because interest is itself a stranded cost, but because interest represents essential compensation for the effect of the time value of money on the stranded cost recovery. *See Reliant*, 101 S.W.3d at 146. If interest is not recovered, a portion of the stranded cost recovery would have to compensate for the time value of money, thus precluding a full recovery. While interest is a necessary means of ensuring full stranded cost recovery, it is not itself a stranded cost.

Furthermore, TIEC's argument that interest is a stranded cost ignores an important implication of *CenterPoint*, specifically that all stranded costs came into existence on the last day before competition began, December 31, 2001. *See* 143 S.W.3d at 90 (stating that "the pertinent date for quantifying stranded costs was December 31, 2001, . . . the last day before customer choice began"). Any stranded costs that were ever going to exist did so on December 31, 2001. If the concept of stranded costs necessarily refers only to those costs that existed on December 31, 2001, then interest on stranded costs, which did not begin to accrue until after December 31, 2001, cannot be considered a stranded cost.

Finally, stranded costs are defined by statute as "the positive excess of the net book value of generation assets over the market value of the assets." Tex. Util. Code Ann. § 39.251(7). As previously discussed, both of these amounts must be quantified as of December 31, 2001. *See CenterPoint*, 143 S.W.3d at 90. Because interest on stranded costs is neither a component of the net book value of generation assets nor a component of the market value of generation assets, it does not fall under the statutory definition of stranded costs.

9

In light of the foregoing, we hold that the Commission did not err in refusing to include interest on stranded costs in its calculation of statewide retail stranded costs.

*Calculation of Statewide Retail Stranded Costs: Up-Front Qualified Costs*

TIEC also argues that the Commission should have included up-front qualified costs in its calculation of statewide retail stranded costs. Up-front qualified costs represent costs incurred when stranded costs are securitized, such as the costs of issuing, supporting, and servicing transition bonds. *See* Tex. Util. Code Ann. § 39.302(4).

Like interest, up-front qualified costs are not part of the net book value of generation assets or the market value of generation assets, and therefore do not fall under the statutory definition of stranded costs. *See id.* § 39.251(7). Also like interest, up-front qualified costs did not come into existence until after December 31, 2001, as they were incurred through transition bonds issued to securitize stranded costs after completion of the true-up proceedings, which could not even be instigated until after January 10, 2004. *See id.* § 39.262(c) (providing that true-up proceedings may begin after January 10, 2004, and that after true-up proceedings are completed, "the remaining stranded costs may be securitized"). As such, up-front qualified costs cannot be stranded costs, as all stranded costs necessarily came into existence on December 31, 2001, the last day before competition began. *See CenterPoint*, 143 S.W.3d at 90. As a result, we hold that up-front qualified costs are not stranded costs and that the Commission did not err in excluding them from its calculation of statewide retail stranded costs for purposes of section 39.253(f).

*Calculation of Statewide Retail Stranded Costs: ADFIT Benefit*

OPC agrees that the Commission properly excluded interest and up-front qualified

costs from its calculation of statewide retail stranded costs, but argues that the statewide total should have been adjusted downward to reflect a financial benefit referred to as the "ADFIT benefit," a result of the cost-free capital available to the utilities in the form of their ADFIT account balances.

The ADFIT account balances represent excess amounts recovered from ratepayers for the purpose of paying federal income taxes that have not yet come due. Because accelerated depreciation is used for income tax deduction purposes, while straight-line depreciation is used for regulatory ratemaking purposes, the income-tax expenses passed on to ratepayers during the early years of an asset's useful life are higher than the taxes actually paid. For regulatory bookkeeping purposes, this excess amount recovered from ratepayers is accounted for as ADFIT. Later in the asset's useful life, the depreciation rate for income tax purposes decreases, causing the utility to pay more in income taxes than the amount of income-tax expense passed on to ratepayers. The utility then uses its ADFIT balance to cover the difference, until the balance ultimately reaches zero. This process results in a period of time in which a utility can access its ADFIT balance as a source of cost-free capital. This benefit, quantified as the time value of the ADFIT balance until it is paid in taxes, is referred to as the ADFIT benefit.

To support its assertion that the ADFIT benefit should be deducted from the calculation of statewide retail stranded costs, OPC points out that in certain true-up proceedings, the Commission reduced the amount of the utility's stranded costs to be recovered from customers by the amount of the ADFIT benefit. According to OPC, the calculation of statewide retail stranded costs for purposes of section 39.253(f) should include only the amount of stranded costs actually recovered from customers, as opposed to the stranded cost amount determined in the true-up proceeding. OPC further contends that because "retail stranded costs" are defined as "that part of

11

net stranded cost associated with the provision of retail service," any deductions or offsets used to reduce the amount of stranded costs actually recovered from customers must be applied to reach a calculation of "net" stranded costs, and by extension, retail stranded costs under section 39.253(f). Tex. Util. Code Ann. § 39.251(6); *see also id.* § 39.253(f) (requiring statewide calculation of "total retail stranded costs").

We disagree with OPC's interpretation of "net stranded cost associated with the provision of retail service." *Id.* § 39.251(6). As OPC concedes, the utilities code does not define the meaning of "net" with respect to stranded costs. Further, there is no authority for the proposition that "net" stranded costs refers only to those stranded costs that were actually recovered from customers. While the Commission did in fact reduce the amount of stranded costs that certain utilities could recover from customers by the amount of the ADFIT benefit, this reduction did not actually reduce the utilities' stranded costs, but merely adjusted the stranded cost recovery to ensure that the utilities did not over-recover. In limiting the amounts of stranded costs that utilities could recover from customers, the Commission did not prevent the utilities from fully recovering its stranded costs. Rather, it determined that the utilities would essentially recover certain amounts through the ADFIT benefit, and therefore need not also recover that amount from customers. The source from which a utility recovers its stranded costs does not alter the fact that such stranded costs exist, nor does it otherwise create an amount of "net" stranded costs that are adjusted based on the means of recovery. Furthermore, like interest and up-front qualified costs, the ADFIT benefit bears no relation to the net book value of generation assets or the market value of generation assets, and therefore does not fall under the statutory definition of stranded costs. *See id.* § 39.251(7). As a result, we hold that retail stranded costs, for purposes of section 39.253(f), are not limited to those

12

stranded costs actually recovered from customers, and therefore that the Commission did not err in refusing to adjust the statewide total of retail stranded costs to reflect the ADFIT benefit amounts.

*Retroactive Reconciliation of Stranded Costs*

OPC further argues that the Commission erred in ordering a retroactive reconciliation of those stranded costs already collected by the utilities from each customer class using the allocation methodology described in utilities code section 39.253(c)-(e), as opposed to section 39.253(f). *Compare id.* § 39.253(c)-(e) (providing that 50% of stranded costs allocated to residential customers are allocated based on PDAFs, that the remaining 50% are allocated based on consumption, and that stranded costs are allocated to non-residential customers based solely on PDAFs), *with id.* § 39.253(f) (providing that state stranded costs exceeding $5 billion are allocated to all customer classes, including residential, based solely on PDAFs). OPC takes the position that because section 39.253(f) does not provide for or require a reconciliation of those stranded costs already collected by the utilities, the allocation of stranded costs exceeding $5 billion should only apply to those stranded costs collected after the date of the Commission's final order in Docket 32795.[3]

OPC is correct in stating that section 39.253(f) does not expressly provide for the retroactive reconciliation of stranded cost amounts already collected. *See id.* § 39.253(f). Significantly, however, section 39.253(f) does provide that "*any* stranded costs in excess of $5 billion shall be allocated" based on PDAFs. *Id.* (emphasis added). To adopt OPC's interpretation

---

[3] As previously discussed, OPC argues that the Commission erred in applying the allocation methodology described in 39.253(f) in the first place because total statewide retail stranded costs should have been reduced to reflect the ADFIT benefit, resulting in a statewide total that is less than $5 billion. However, OPC further argues that even if we determine that the Commission properly calculated the statewide total, the Commission nevertheless erred in retroactively reconciling the allocation of stranded costs.

of the statute would require us to read the phrase, "any stranded costs in excess of $5 billion," to mean "any stranded costs in excess of $5 billion that remain uncollected at the time the statewide total is calculated." We must construe section 39.253(f) according to its plain language and may not add words that are not implicitly contained in the language of the statute. *See Lee v. City of Houston*, 807 S.W.2d 290, 295 (Tex. 1991). Based on the plain language of the statute, the legislature clearly intended to apply the allocation methodology described in 39.253(f) to all stranded costs in excess of $5 billion, as opposed to just those stranded costs that had not yet been recovered by utilities at the time statewide retail stranded costs were calculated. Furthermore, because the Commission cannot fulfill the statutory requirements of section 39.253(f) unless it has the authority to order a retroactive reconciliation of stranded costs already collected, this authority is necessarily implied by the statute. *See Public Util. Comm'n v. City Pub. Serv. Bd.*, 53 S.W.3d 310, 316 (Tex. 2001) ("[W]hen the Legislature expressly confers a power on an agency, it also impliedly intends that the agency have whatever powers are reasonably necessary to fulfill its express functions or duties."). As a result, we hold that the Commission did not err in ordering a retroactive reconciliation of those stranded costs already collected by the utilities.

*Interest on Reconciled Amounts*

OPC further argues that even if the Commission was authorized to order a retroactive reconciliation of those stranded costs already collected, the Commission erred in ordering the residential customers to pay interest on the reconciled amounts to the non-residential customer classes. TIEC, on the other hand, asserts that the Commission was proper in assessing interest on the reconciled amounts, but argues that the interest rate imposed was not supported by substantial evidence and was too low to sufficiently compensate the non-residential customers for their initial

14

overpayment of stranded costs.

The supreme court held in *CenterPoint* that while the recovery of interest on stranded costs by the deregulated utilities was not authorized by statute, it was necessarily implied because the utilities could not fully recover stranded costs unless they were also compensated for the time value of money. 143 S.W.3d at 84; *see also Reliant*, 101 S.W.3d at 146. Similarly, while the recovery of interest by the non-residential customer classes is not expressly authorized by statute, it is necessarily implied in order to fully compensate them for those stranded costs that they have overpaid under the allocation methodology of section 39.253(c)-(e) since stranded costs came into existence on January 1, 2002. Because the imposition of interest on the reconciled amounts is necessary to fully compensate the non-residential customer classes for their overpayment of stranded costs in excess of $5 billion, we hold that the Commission did not err in ordering the payment of such interest.

With respect to the proper interest rate to be applied to reconciled amounts, TIEC cites the testimony of its expert, who recommended applying the approximately 10% interest rate that had previously been applied by the Commission to the utilities' unamortized stranded cost balances. According to TIEC's expert, this rate is not only a suitable proxy for the ratepayers' opportunity costs, but is actually a conservative measure because consumers are likely to have higher opportunity costs than the utilities due to their tendency to employ more equity than utilities in financing investments. The Commission, on the other hand, points to the testimony of OPC's expert, who opined that the proper interest rate to be applied to the reconciled amounts was the approximately 5% rate applicable to utility transition bonds. To support this position, OPC's expert stated, "The vast majority of stranded costs are financed by securitized transition bonds. Therefore,

the actual 'time value' cost of re-allocating stranded costs among customer classes should be based on the weighted average securitization interest rate."

The parties agree that the substantial-evidence rule applies to this issue, requiring us to affirm the Commission's decision as long as there is a reasonable basis in the record to support it. *See* Tex. Util. Code Ann. § 15.001; Tex. Gov't Code Ann. § 2001.174; *Cities of Abilene, San Angelo, & Vernon*, 146 S.W.3d at 748; *see also City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 185 (Tex. 1994) ("[T]he evidence in the record may preponderate against the decision of the agency and nonetheless amount to substantial evidence.").

Given the expert testimony regarding the propriety of adopting the 5% interest rate applicable to the securitization of stranded costs, we cannot say that there is no reasonable basis in the record to support the Commission's decision to apply that rate to the reconciled amounts. While TIEC presented expert testimony that conflicted with the testimony in favor of the 5% rate, in a substantial-evidence review, we must resolve all evidentiary conflicts in favor of the Commission's decision. *See Texas State Bd. of Med. Exam'rs v. Scheffey*, 949 S.W.2d 431, 437 (Tex. App.—Austin 1997, writ denied). Accordingly, we affirm the Commission's decision to impose an interest rate of approximately 5% on the reconciled amounts.

*Unexpended Environmental Retrofit Costs*

In its sole issue on cross-appeal, the Commission argues that the trial court erred in remanding the issue of unexpended environmental retrofit costs back to the Commission for the presentation of additional evidence. During the course of the administrative proceeding, OPC requested that the total statewide retail cost calculation be adjusted to take into account another case pending before the Commission that would determine the amount that a particular utility,

16

CenterPoint, might be required to refund for unused environmental retrofit costs. At the time of OPC's request, discovery had not yet been completed in the CenterPoint proceeding. OPC first made its request at SOAH, but the administrative law judges refused to consider the issue on the ground that the CenterPoint refund was outside the scope of the Commission's remand order. OPC then filed a motion with the Commission to amend the remand order to include consideration of the CenterPoint refund. The Commission denied the motion on procedural grounds, citing its rule requiring motions for reconsideration of interim orders to be filed within five working days of the issuance of the order. *See* 16 Tex. Admin. Code § 22.123(b)(2) (2009) (Pub. Util. Comm'n, Appeal of Interim Order & Motions for Reconsideration of Interim Order Issued by Comm'n) (hereinafter, "Rule 22.123(b)(2)").

In considering this issue, we review the following timeline of relevant events:

June 8, 2006: Commission staff file petition to initiate Docket 32795

June 29, 2006: Case referred to SOAH

October 27, 2006: Record closed in SOAH

December 13, 2006: Initial proposal for decision issued

February 16, 2007: Commission issues order of remand to SOAH

March 12, 2007: OPC files motion in SOAH for consideration of CenterPoint refund

May 18, 2007: SOAH administrative law judges deny OPC's motion

May 21, 2007: OPC files motion with Commission for amendment of remand order

June 13, 2007: Commission denies motion to amend remand order

July 30, 2007: Record on remand closed in SOAH

September 27, 2007: Remand proposal for decision issued

November 26, 2007: Commission's final order issued

In denying OPC's motion to amend the remand order, the Commission construed the motion as a motion for reconsideration of the remand order. Relying on Rule 22.123(b)(2), the Commission stated:

> OPC's motion effectively asks that the Commission reconsider its Order on Remand and add new issues to be considered by the ALJs. Under [Rule] 22.123(b)(2), a motion for reconsideration of an interim order issued by the Commission must be filed within five working days of the issuance of the written interim order. OPC's motion was filed more than five working days after the Order of Remand was issued, is not timely, and is therefore denied.

We must defer to the Commission's interpretation of its own rules unless it is inconsistent with the rule or is plainly erroneous. *Public Util. Comm'n v. Gulf States Utils. Co.*, 809 S.W.2d 201, 207 (Tex. 1991). The Commission's determination that Rule 22.123(b)(2) mandates denial of OPC's motion as untimely is neither inconsistent with the plain language of the rule nor plainly erroneous. Furthermore, a state agency exercises discretionary control over procedural issues related to its own administrative docket. *See Meier Infiniti*, 918 S.W.2d at 101 (applying abuse-of-discretion standard to issue of whether agency erred in not granting party's motion to reopen evidentiary hearing, noting that agency decisions "on matters involving the agency's administrative docket are within the discretionary control of the hearing officer"). As there is no question that OPC's motion was filed well after five working days past the date of the remand order, we hold that the Commission did not abuse its discretion in denying the motion as untimely under Rule 22.123(b)(2).

18

While OPC argues that the Commission erred in failing to sua sponte consider the evidence related to the CenterPoint refund, we find it significant that the CenterPoint proceeding was still in the discovery stage at the time of OPC's request. Administrative proceedings related to the deregulation process are extraordinarily complex and often take years to reach a final result. At some point, the Commission must have the authority to close the record and cease reviewing newly developing evidence. Otherwise, it would be practically impossible for the Commission to reach a final decision on issues such as the total statewide retail stranded cost calculation, where any number of proceedings that might possibly yield numbers pertinent to such a calculation are in various stages of administrative or judicial review at any given time. Furthermore, the record in Docket 32795, with the exception of that portion of the record related to issues in the remand order, had been closed almost five months by the time OPC made its initial request at SOAH that the CenterPoint refund be considered. "The question of whether to reopen an administrative record to allow additional evidence is one addressed to the discretion of the administrative body." *El Paso v. Public Util. Comm'n*, 609 S.W.2d 574, 578 (Tex. Civ. App.—Austin 1980, writ ref'd n.r.e.). We cannot conclude, on this record, that the Commission abused its discretion in declining to reopen the record to consider evidence related to the possible result of a separate and ongoing administrative proceeding.

We sustain the Commission's issue on cross-appeal, reverse that portion of the trial court's judgment remanding the case back to the Commission for additional evidence, and render judgment affirming the Commission's final order in its entirety.

19

## CONCLUSION

We affirm the trial court's order to the extent it affirms the Commission's decision. We reverse that portion of the trial court's order remanding the issue of environmental retrofit costs back to the Commission for the presentation of additional evidence, and render judgment affirming the Commission's final order in its entirety.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Waldrop and Henson

Affirmed in part; Reversed and Rendered in part

Filed:   January 15, 2010